IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-cv-00609-MSK

**CORRINE CHANCELLOR,**

    Plaintiff,

v.

**NANCY A. BERRYHILL, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,**

    Defendant.

# OPINION and ORDER

**THIS MATTER** comes before the Court on Plaintiff Corrine Chancellor's appeal from the Commissioner of Social Security's (the "Commissioner") final decision denying her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§1381-83c. Having considered the pleadings and the record, the Court

**FINDS** and **CONCLUDES**

## I. Jurisdiction

Ms. Chancellor filed a claim for disability insurance benefits pursuant to Titles II and XVI in January 2014, asserting that her disability began on December 15, 2012. After her claim was initially denied, Ms. Chancellor filed a written request for a hearing before an Administrative Law Judge (the "ALJ"). This request was granted and a hearing was held in December 2015.

The ALJ's Decision applied the five-step social security disability claim evaluation process: (1) Ms. Chancellor had engaged in substantial gainful activity ("SGA") after December 15, 2012[1]; (2) she had the severe impairments of schizoaffective disorder (bipolar type), generalized anxiety disorder, and personality disorder (not otherwise specified); (3) she did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, App'x 1; and (4) Ms. Chancellor had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with various limitations, and that with this RFC, she could perform her past relevant work as a laboratory assistant. Accordingly, the ALJ determined that she was not disabled. 20 C.F.R. § 404.1565.[2]

The Appeals Council denied Ms. Chancellor's request for review of the Decision, making the Decision the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). The Appeals Council also considered additional materials submitted by Ms. Chancellor and concluded that "the additional evidence did not provide a basis for changing the Administrative Law Judge's decision." (**#11-2**, at p. 3.) Accordingly, the newly submitted materials are now part of the record on this appeal. *Chambers v. Barnhart*, 389 F3d. 1139 (10th Cir 2004) (citing *Odell v. Shalala*, 44 F3d 855 (10th Cir 1994)).

---

[1] As explained below, the ALJ apparently proceeded past the "Step 1" stage of the analysis in an abundance of caution. He could have stopped at that point, given that a finding that the social security claimant engaged in SGA after the date of onset of the disability is sufficient in and of itself to deny the claim.

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2016 edition, which was the version in effect at the time of the ALJ's decision. Hereafter, the Court will only cite the pertinent Title II regulations governing disability insurance benefits, found at 20 C.F.R. Part 404. The corresponding regulations governing supplemental security income under Title XVI, which are substantively the same, are found at 20 C.F.R. Part 416.

Ms. Chancellor's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. Issue Presented

Ms. Chancellor asserts two principal arguments. First, she contends that the Decision improperly concluded that she had engaged in SGA because a significant portion of the income identified in the Decision actually was a subsidy unrelated to the value of the work that she performed. As a subsidy, it should not have been considered in determining whether Ms. Chancellor was engaged in SGA. Second, she argues that at Step 4 stage of the analysis, the ALJ improperly gave less-than-controlling weight to the opinions of her treating physicians.

## III. Relevant Material Facts

Ms. Chancellor claims that she due to disabled by a number of mental disorders, including a generalized anxiety disorder, personality disorder and a schizoaffective disorder (bipolar type) that has caused her to experience a number of psychotic breaks. She claims the onset of this disability occurred on or before December 15, 2012. As a result of her mental illness, she has been hospitalized numerous times since May 2008, most recently in 2013 and 2014 in response to episodes of suicidal ideation. Ms. Chancellor was prescribed medication beginning in 2008 (at first, Zyprexa, Risperdal and Invega, and later, Lamictal, Seroquel and Metformin). She adheres to her medication regime relatively well, but continues to experience disabling mental limitations.

During the applicable period, Ms. Chancellor was a student at Metropolitan State College/University ("MSU"), where she majored in graphic design (digital arts). Ms. Chancellor testified that she attended college off and on from 2000 until 2015, with a break from school from 2004 to 2009. She graduated from MSU with a Bachelors of Fine Arts degree in December

2014. Ms. Chancellor testified that she did not pursue a graduate degree because she "barely made it through" the undergraduate program.

During 2012 and 2013, Ms. Chancellor participated in a work-study program. She first worked as a lab technician, and then as a graphic designer. In the former capacity, she sat at a desk, cleaned the labs, answered questions and filed papers. In the latter, she made lab posters, edited training videos, answered photoshop questions, took photos, edited scripts and recorded voiceovers. Ms. Chancellor indicates that she was able to balance her class load at MSU with her work-study job because she was permitted time to study and do homework at the job, especially when working as a lab technician.

At multiple points in the record, Ms. Chancellor stressed that she experienced performance difficulties at the job. She stated that she was frequently absent or extremely tardy, she worked at a much slower pace than her coworkers, she made numerous mistakes, and she had significant difficulties communicating with other people, especially including her supervisors. At the hearing, Ms. Chancellor explained that she was able to hold her work-study job despite these difficulties because "it was really low stress, really low expectations, it's like a really easy job, and I still had symptoms…." She also suggested in her disability application materials that "[i]t has always felt like a few people helped or gave me extra slack."

Subsequent to the Decision, Ms. Chancellor submitted a letter stating that she received Americans with Disability Act ("ADA")/Rehabilitation Act accommodations from MSU in both her academic classes and in her participation in the work-study program. She also submitted letters from the MSU administration officials to various professors informing them of her disabled status and her need for accommodation in those classes. However, there are no similar

4

letters giving such notice to work-study advisors. Ms. Chancellor's eligibility to participate in work-study ended in December 2013, and she has not had gainful employment since.

Ms. Chancellor's earnings records reflect that she earned $13,171.77 in 2012, and $15,969.22 in 2013 from the work-study program. Ms. Chancellor generally was scheduled to work thirty hours per week, and that she was only eligible for the work-study program so long as she maintained a minimum class load and achieved sufficient grades.

**Treatment records and opinions:**

Treatment records date from 2008 until December 2015. While Ms. Chancellor was a student at MSU, she was treated at the Mental Health Center of Denver and the Health Center at Auraria. In addition, she regularly saw a university psychologist. She reported suffering from paranoia and having difficulty leaving her house, low energy levels and sleeping problems that require her to get thirteen hours of sleep per day in order to function on her medication. Medical records indicate that she suffered from agitation, poor concentration and excessive worry associated with her general anxiety disorder. She also has substantial difficulty communicating and getting along with others, which manifests in her distrust and suspicion towards other people, a negative self-image, acting impulsively, displaying excessive emotionality, and instability in her relationships.

Hospital records in November 2013 reflect that Ms. Chancellor voluntarily admitted herself due to an acute episode of suicidal ideation during which she walked into traffic. Ms. Chancellor reported that she also experienced high levels of stress due a break-up with her boyfriend and the recent death of a friend. Hospital records reflect that she reported experiencing delusions and hallucinations, and she seemed easily distracted and scored poorly on a memory test. Hospital records for April 2014 hospitalization also reflect admission due to Ms.

5

Chancellor's thoughts of suicide and auditory hallucinations. She attributed this episode to a recent visit from an ex-boyfriend that did not go well.

Mental health provider treatment notes during 2011 until 2014 reflect regular mental health care. Ms. Chancellor had periodic appointments with a psychiatrist Dr. Carole Kornreich, M.D. In October 2013, Ms. Chancellor switched to a new provider, Dr. Melinda Motes, M.D. Initially, treatment records reflect that Ms. Chancellor reported doing well, but approximately one month after the initial consultation, Ms. Chancellor was hospitalized. A few weeks later, after adjustment in medication, Ms. Chancellor reported feeling much better.

In December 2013, Ms. Chancellor's care was undertaken by the Mental Health Center of Denver, and her primary treating provider was a psychiatrist, Dr. Carmen Davilo-Toro, M.D. Initial treatment notes show Ms. Chancellor reporting of anxiety, depression and occasional suicidal ideation without intent or plan. Subsequent records reflect increased depression culminating in another hospitalization in April 2014.

There are three functional capacity opinions in the record. Dr. Gail Bruce-Sanford, the psychologist who treated Ms. Chancellor, completed a benefits eligibility form to the Colorado Department of Human Services ("CDHS"), in which she opined that although Ms. Chancellor was not totally disabled, she was not able to engage in her usual occupation.

The second opinion was offered by Dr. Davilo-Toro in a Medical Source Statement dated December 18, 2015. It states that Ms. Chancellor has mild impairments in being able to understand and remember simple instructions; moderate-to-marked impairments in the ability to make judgments on simple work-related decisions, understanding and remembering complex instructions, carrying out complex instructions; and a marked impairment in the ability to make judgments on complex work-related decisions. In addition, Ms. Chancellor has moderate-to-

marked impairment in her ability to interact appropriately with the public, moderate impairment in her ability to interact with supervisors, moderate impairment in her ability to interact appropriately with coworkers, and marked impairment in her ability to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Davilo-Toro explained that Ms. Chancellor would have difficulty sustaining a task for a prolonged period of time and completing complex tasks and that when Ms. Chancellor is required to deal with stress or conflict, her symptoms worsen, and she can suffer from paranoid delusions, psychosis, cognitive disturbances and misinterpretations.

The third opinion was rendered by Dr. Gayle Frommelt, Ph. D., a State agency psychological consultant, who conducted a record review through July 2014, but who did not consider Dr. Davilo-Toro's opinion. Although Dr. Frommelt agreed that Ms. Chancellor suffered from mental disorders that limited her ability to function, she concluded that the severity of her limitations during periods where Ms. Chancellor is properly medicated is not "entirely supported" by the medical evidence in the record, and that "[Ms. Chancellor's] statements are partially credible." Ultimately, Dr. Frommelt opined that Ms. Chancellor can follow simple instructions, sustain ordinary routines, and make simple work-related decisions.

**Testimony and Decision**

At the hearing, the ALJ asked several questions about Ms. Chancellor's job with the MSU work-study program. He specifically asked if she could go back to her laboratory technician job. Ms. Chancellor responded that it was a low stress, easy job, where she seemed to have been granted a great deal of leniency, but she ultimately did not answer whether she could return to it because it was only a work-study position. The ALJ also asked the vocational expert whether someone with Ms. Chancellor's limitations (a concentration impairment, a social

7

interaction impairment, and a manipulative impairment in the upper right extremity) would be able to perform Ms. Chancellor's prior work. The vocational expert testified that she would be able to resume work as a laboratory assistant.

In the Decision, the ALJ determined that Ms. Chancellor was not disabled based on two alternative findings. First, the ALJ found that Ms. Chancellor had engaged in SGA during relevant time period based on significant earnings from the work-study program. Alternatively, the ALJ found that Ms. Chancellor had a RFC sufficient for her to perform her past relevant work as a lab assistant.

The ALJ specifically found that Ms. Chancellor had a RFC to perform full range of work at all exertional levels, subject to an SVP of 1 or 2, and with limitations in use of her right arm and only occasional public interaction. In making this finding, the ALJ gave only partial weight to Dr. Dr. Davilo-Toro's limitations that she "had marked difficulties in making judgments and responding to normal work situations" because the ALJ found such limitations to be inconsistent with Ms. Chancellor's ability to perform her part-time work-study job. In contrast, the ALJ gave great weight to Dr. Frommelt's opinion because he found it to be consistent with the claimant's treatment history and "her ability to maintain a job throughout much of the alleged disability".

### IV. Standard of Review

On appeal, a reviewing court's judicial review of the Commissioner of Social Security's determination that claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the Commissioner's decision is supported by substantial evidence. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). Substantial

evidence is evidence that a reasonable mind would accept as adequate to support a conclusion. *Brown*, 912 F.2d at 1196; *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla of evidence but less than a preponderance of the evidence. *Lax*, 489 F.3d at 1084; *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). Although a reviewing court should meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner.

## V. Discussion

Ms. Chancellor challenges the findings made by the ALJ at Steps 1 and 4. Because these were alternative findings justifying the determination that Ms. Chancellor is not disabled, the Court must affirm the determination if either finding was proper.

### A. Step 1

Step 1 of the social security disability analysis requires a claimant to establish that he or she has not engaged in "substantial gainful activity" during the period of disability. 20 C.F.R. §§ 404.1520(b), 404.1572; *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731-32 (10th Cir. 2005). SGA is defined as work activity that is both substantial and gainful. Specifically, SGA must consist of work activity that (i) involves doing significant physical or mental activities (even if done on a part-time basis) and (ii) for pay or profit. 20 C.F.R. §§ 404.1572(a)-(b); *Atkinson v. Astrue*, No. 08-cv-00646-LTB, 2009 WL 198027, at *3 (D. Colo. Jan. 28, 2009). As part of the Step 1 analysis, the ALJ ascertains a claimant's earnings during the time period in question. 20 C.F.R. § 404.1574(a)(1); *Soto v. Colvin*, No. 13-cv-02454-MJW, 2015 WL 1259051, at *4 (D. Colo.

9

March 16, 2015). If the earnings exceed a nominal monthly threshold – about $1,010 per month in 2012, and $1,040 per month in 2013 – then there is a rebuttable presumption that the claimant had substantial earnings and was engaged in SGA. 20 C.F.R. § 404.1574(b)(2)(ii); *see also Franco v. Chater*, 98 F.3d 1349, 1996 WL 559641, at *1 (10th Cir. Oct. 2, 1996) (table).

This calculation, however, is subject to modification if the claimant has been overpaid for the services rendered. In such case, the overpayment is deemed to be a subsidy. 20 C.F.R. § 404.1572(a)(2). This regulation provides:

> We consider only the amounts you earn. When we decide whether your earnings show that you have done substantial gainful activity, we do not consider any income that is not directly related to your productivity. *When your earnings exceed the reasonable value of the work you perform, we consider only that part of your pay which you actually earn. If your earnings are being subsidized, we do not consider the amount of the subsidy when we determine if your earnings show that you have done substantial gainful activity.* We consider your work to be subsidized if the true value of your work, when compared with the same or similar work done by unimpaired persons, is less than the actual amount of earnings paid to you for your work. For example, when a person with a serious impairment does simple tasks under close and continuous supervision, our determination of whether that person has done substantial gainful activity will not be based only on the amount of the wages paid. We will first determine whether the person received a subsidy; that is, we will determine whether the person was being paid more than the reasonable value of the actual services performed. We will then subtract the value of the subsidy from the person's gross earnings to determine the earnings we will use to determine if he or she has done substantial gainful activity.

20 C.F.R. § 404.1572(a)(2) (emphasis added).

In regulatory guidance, the Social Security Administration states that the "subsidization" principle encompasses a scenario where a generous employer pays a disabled or otherwise impaired employee excess compensation *vis-à-vis* the value of the work that he or she performs. "An employer may, because of a benevolent attitude toward a handicapped individual, subsidize the employee's earnings by paying more in wages than the reasonable value of the actual services performed. When this occurs, the excess will be regarded as a subsidy rather than

earnings." Soc. Sec. Ruling 83–33, 1983 WL 31255, at *3 (1983). A special arrangement in which an employer goes to great lengths to accommodate a disabled employee's impairment may constitute "[n]on-specific subsidies," which can include, among other things, modified job duties and "unusual assistance or supervision." *Id.* at 4-5; *see also Reeves v. Colvin*, 544 Fed. App'x 786, 788 (9th Cir. 2013).

Another situation in which compensated work is not treated as SGA is when the work is performed under "special conditions." [3] The "special condition" exception is found in 20 C.F.R. § 404.1573(c), which provides:

> If your work is done under special conditions. The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity. … Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which –
>
>> (1) You required and received special assistance from other employees in performing your work;
>>
>> (2) You were allowed to work irregular hours or take frequent rest periods;
>>
>> …
>>
>> (5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or
>>
>> (6) You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare.

20 C.F.R. § 404.1573(c).

The fact that work is being performed under special conditions does not *necessarily* mean that its compensation is not included as SGA, and the existence of special conditions is an

---

[3] Although Ms. Chancellor does not expressly argue the application of this exception, she contends in her briefing that she was working under special conditions.

11

important factor in consideration of how much compensation to count toward SGA. *Id.*; *see also Martinez v. Comm'r of Soc. Sec.*, 132 Fed. App'x 310, 313 (11th Cir. 2005).

Here, the ALJ found that because Ms. Chancellor earned almost $16,000 dollars in 2013 (or about $1,330 per month) from her part-time work-study job and that such earnings presumptively constituted SGA. The Decision contains no discussion of whether any portion of Ms. Chancellor's earnings was a subsidy, nor does it reflect consideration of whether she worked under special conditions. Ms. Chancellor contends that this was an error. She contends that the full amount of her 2013 compensation should not have been considered as earnings for the purposes of the SGA analysis, because the unrebutted evidence that her supervisors at MSU tolerated her poor and untimely performance, extreme tardiness, and poor communication skills, and that she asked for and received disability-based ADA and Rehabilitation Act accommodation in both her classes and her work environment, made some portion of her earnings a subsidy. In addition, she argues that the ALJ should have regarded this environment as constituting "special circumstances" for which additional scrutiny was required.

There is no dispute that the ALJ failed to demonstrate consideration of whether any of Ms. Chancellor's income constituted a subsidy, and that there is no discussion of whether her work-study job constituted "special circumstances." The question is whether such omission constitutes error.

The Commissioner has the duty to develop an adequate record relevant to the issues raised. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997); *Jaramillo v. Massanari*, 21 Fed. App'x 792, 795 (10th Cir. 2001). Courts in this district and elsewhere have held that this specifically includes a situation in which an ALJ is aware of some evidence that the compensation received by the claimant for past work included – at least in part – a subsidy or

that the claimant's prior work was performed under special conditions. *See, e.g., Melville v. Apfel*, 198 F.3d 45, 52-54 (2d Cir. 1999); *Perez v. Colvin*, No. 14-cv-02436-RM, 2015 WL 8478441, at *7 (D. Colo. Dec. 9, 2015) (evidence of subsidy); *Martinez v. Astrue*, No. 11-cv-00654-WYD, 2012 WL 1045230 (D. Colo. Mar. 28, 2012) (evidence of special working circumstances).

Furthermore, the fact that evidence is submitted after an ALJ issues his or her decision, but before the Social Security Appeals Council takes final action on that decision, does not excuse the Commissioner from reviewing that evidence. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). While it certainly is best for a claimant to submit evidence as early as possible in the application process, the Appeals Council stage of that process constitutes "an administrative decision to give a claimant a last opportunity to demonstrate disability before the decision becomes final," and as such, *all* evidence in the administrative record can be considered upon judicial review. *Id.*

Here, the combination of Ms. Chancellor's statements about her condition, her testimony about the nature of her work-study jobs at MSU, and the late submitted evidence that MSU considered her to be disabled under the ADA and directed that her limitations be accommodated, is sufficient to trigger the obligation of the ALJ to develop the record with regard to issues of subsidy and special conditions. Ms. Chancellor provided a detailed handwritten statement in which she stated that her mental disorder "limit[s] my ability to pay attention, socialize [and] communicate with others, and to attend work regularly." That handwritten statement asserts that it is very for difficult for Ms. Chancellor to organize time and tasks, and her anxiety and paranoia has caused her to miss or be late to work frequently. It further states that her condition causes her to miss assignments and she cannot work quickly. At another part of the disability benefits

13

application, Ms. Chancellor wrote that she has always felt like people help her or give her extra slack, and that she has been a liability everywhere that she has worked. She stated that she has always needed extra time, extra compensation for mistakes, and leniency due to her frequent absences at work. At the hearing, Ms. Chancellor addressed her working conditions in the work-study laboratory assistant job. She explained that "it was a work study job and it was really low stress, really low expectations, it's like a really easy job and I still had symptoms… because I was late for like two months in a row, severely late, more than their 15-minute lenience, so…." Later, Ms. Chancellor testified that she was able to study and do homework on the job. This is consistent with numerous references in her psychological and psychiatric treatment records, in which she explains reduced (or increased) class loads to her mental health providers in terms of her ability to do the homework while at work. In addition, in her *pro se* request for review by the appeals council, she explained that she received ADA/Rehabilitation Act accommodations from MSU in both the academic and work settings, and that she likely could not have kept her employment without those accommodations. She also included the contact information for someone at MSU who could speak to her accommodations through the work-study program. While an ADA/Rehabilitation Act accommodation is not the same thing as a subsidy or special work conditions, it should have been clear to the Commissioner that Ms. Chancellor was attempting to argue that her employment through the MSU work-study program should not be treated as a "real" job for the purposes of the SGA analysis, because her employer gave her far more lenient and accommodating treatment than she would have received in a more "normal" (*i.e.*, non-work-study) working environment.

      The Court expresses no opinion as to the ultimate determination of whether Ms. Chancellor was working under special conditions or her income through the work-study program

*was*, in fact, subsidized, and thus should be discounted when determining whether she engaged in SGA. However, based on the evidence of record, the Commissioner should have developed the evidentiary record and specifically addressed whether the compensation Ms. Chancellor received was a subsidy, in whole or part, and whether she was working under special conditions that affected the determination of whether she was engaged in SGA. The Commissioner's failure to do so constitutes legal error.

**B.     Step 4**

The ALJ also found that Ms. Chancellor was not disabled at Step 4 of his analysis based on a finding that her RFC would allow her to perform her prior laboratory assistant work. Ms. Chancellor argues that the ALJ erred in determining her RFC because he failed to give controlling – or even sufficient – weight to the limitations expressed by her treating physician (Dr. Davilo-Toro), and instead, gave greater weight to the opinion of a non-examining, non-treating State agency physician. According to Ms. Chancellor, if the Decision had given the proper controlling weight to Dr. Davilo-Toro's opinion that Ms. Chancellor had marked or moderate-to-marked impairment in a number of different comprehension and decision-making areas, the Step 4 finding would have been different.

The Court begins with an observation that the parties agree that Dr. Davilo-Toro was Ms. Chancellor's treating physician. 20 C.F.R. § 404.1527(a). Inexplicably, however, the ALJ failed to demonstrate application of the required two step analysis for evaluation of his opinion. The general rule is that an ALJ is "required to give controlling weight to a treating physician's opinion about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and any physical or mental restrictions, if 'it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial

15

evidence in the record.'" *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (citation omitted); *accord Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011); *see also* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2-3 (1996).[4] If the treating source opinion is deficient in either of those aspects (*i.e.*, well supported by clinical/laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record) it will not be given controlling weight. *Watkins*, 350 F.3d at 1300. Only if it is not accorded controlling weight, is the opinion of a treating physician given weight in comparison to other opinions.

Here, the Decision makes no mention of an assessment of whether Dr. Davilo-Toro's opinion was entitled to controlling weight. Instead, it states only that the ALJ gave it only "partial" weight because "[t]he claimant attended school and maintained a part-time work/study job throughout most of the alleged period of disability. Her ability to perform this job is not consistent with Dr. Davilo's opinion that the claimant had marked difficulties making judgment and responding to normal work situations." The Court surmises that this was intended to be an assessment of controlling weight with a finding that the source opinion is inconsistent with other substantial evidence in the record. *Bean*, 77 F.3d at 1214. Viewed from that perspective, and noting that the ALJ is obligated to clearly identify the other substantial evidence that is inconsistent with Dr. Davilo-Toro's opinion, it appears that the inconsistent evidence is that Ms. Chancellor attended school and maintained a part-time work/study job.

As is noted in the Step 1 analysis, the nature of Ms. Chancellor's abilities to perform her school work and her job responsibilities is far from clear. As a consequence, mere reference to the fact that she went to school and had a work-study job, by itself, is *not* inconsistent with Dr.

---

[4] Social Security Ruling 96-2p was rescinded effective March 27, 2017, but it remains applicable to disability claims – like Ms. Chancellor's – filed before that date. *Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 2017 WL 3928298, at *1 (2017).

16

Davilo-Toro's opinion that she has marked or moderate-to-marked impairments in: (1) the ability to make judgments on simple work-related decisions; (2) understand and remember complex instructions; (3) carry out complex instructions; (4) the ability to make judgments on complex work-related decisions; (5) the ability to interact appropriately with the public; and (6) the ability to respond appropriately to usual work situations and to changes in a routine work setting. There is a good bit of evidence in the record that Ms. Chancellor's instructors and work-study supervisors afforded her exceptional leniency in numerous ways, including by excusing her frequent absences and extreme tardiness over extended periods of time, tolerating a slow work pace and missed assignments, and generally giving her "extra slack" on the job. Ms. Chancellor testified at the hearing that the work-study job was "really low stress, really low expectations, it's like a really easy job," and she was even able to do homework while on the job, at least while working as a laboratory assistant. In addition, the materials submitted by Ms. Chancellor after the Decision was issued evidence accommodations made based on her impairments both in her school work and work-study tasks. Without analysis of the types of limitations and accommodations that Ms.Chancellor experienced while at MSU, the finding that Dr. Davilo-Toro's limitations are inconsistent with her prior performance is unspecific and unsupported.

## Conclusion

Finding reversible error both at Step 1 and Step 4, the Commissioner of Social Security's Decision is **REVERSED** and **REMANDED.** The Clerk shall enter a Judgment in accordance herewith.

DATED this 22nd day of February 2018.

BY THE COURT:

_____
Marcia S. Krieger
United States District Judge